UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| WILLA M. QUICK BEAR,<br><br>               Plaintiff,<br><br>   vs.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner, Social Security<br>Administration,<br><br>             Defendant. | CIV. 13-5006-JLV<br><br><br>ORDER |

## INTRODUCTION

Plaintiff Willa Quick Bear filed a complaint appealing from an administrative law judge's ("ALJ") decision denying disability benefits. (Docket 1). Defendant[1] denies plaintiff is entitled to benefits. (Docket 9). The court issued a briefing schedule requiring the parties to file a joint statement of material facts ("JSMF"). (Docket 11). The parties filed their JSMF. (Docket 15). For the reasons stated below, plaintiff's motion to reverse the decision of the Commissioner (Docket 17) is granted.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 15) is incorporated by reference. Further recitation of salient facts is included in the discussion section of this order.

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Ms. Colvin is automatically substituted for Michael J. Astrue as the defendant in all pending social security cases. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

On May 13, 2009, Ms. Quick Bear applied for Social Security disability and supplemental security income benefits alleging a disability date of January 6, 2009.   Id. ¶ 1.   An evidentiary hearing was held on July 6, 2011, before an ALJ. Id. ¶ 2.   On July 18, 2011, the ALJ issued a decision finding Ms. Quick Bear was not disabled and denying benefits.   Id. ¶ 3; see also Administrative Record, pp. 15-24.[2]   Ms. Quick Bear sought review by the Appeals Council, which denied the request.   (Docket 15 ¶ 3).   The ALJ's decision is the final decision of the Commissioner of the Social Security Administration.   Ms. Quick Bear timely filed a complaint requesting judicial review.   (Docket 1).

The issue before the court is whether the ALJ's decision that Ms. Quick Bear was not "under a disability within the meaning of the Social Security Act, from January 16, 2009, through [July 18, 2011]" is supported by the substantial evidence in the record as a whole.   (AR at p. 15); see also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole.   42 U.S.C. § 405(g); Choate v.

---

[2]The court will cite to information in the administrative record as "AR at p. ____."

2

Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580. The court reviews the Commissioner's decision to determine if an error of law was committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny disability benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the decision of the Commissioner if that decision is supported by good reason and is based on substantial evidence. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

## DISCUSSION

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled. 20 CFR

3

§§ 404.1520(a)(4) and 416.920(a). If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled. Id. The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations. (AR at pp. 18-24).

Ms. Quick Bear challenges the ALJ's decision on two grounds. Those are:

1. Did the ALJ properly determine Ms. Quick Bear's credibility?

2. Did the ALJ properly consider the opinions of a treating physician?

(Docket 17). Each of these issues will be separately addressed.

## 1. DID THE ALJ PROPERLY DETERMINE MS. QUICK BEAR'S CREDIBILITY?

At step two of the evaluation process the ALJ found Ms. Quick Bear had the following severe impairments: "Degenerative disc disease of the lumbar spine, Diabetes Mellitus, and Obesity . . . ." (AR at p. 18). It is undisputed Ms. Quick Bear suffered "very extensive degenerative disease primarily around the L5-SI [and] L4-L5 range with spurring of lateral vertebrae throughout L2-3-4 and L5 disk space narrowing and some bridging is noted quite extensively throughout the lumbosacral vertebrae." (Docket 15 ¶ 54). The ALJ noted this portion of the medical record. "X-rays of the lumbar spine showed several levels

of degenerative disc disease."[3]   (AR at p. 20).   There is no mention of the impact

of this severe impairment throughout the remainder of the ALJ's decision.

Concerning Ms. Quick Bear's diabetes, the ALJ made the following

findings:

> The claimant's diabetes has been poorly controlled . . . . She had not been compliant with her diet and medication.   (AR at p. 20);

> [T]he claimant acknowledged that she is still eating lots of fried foods . . . She had not been adhering to the low fat diabetic diet. . . . She admitted to being challenged in trying to eat correctly.   Id. at p. 21;

> [T]he claimant was not reliably doing accucheks . . . . She stated that her meals were frequently eaten away from her home.   She is noncompliant lately. . . . She gets treatment for diabetes but complained that the health care on the reservation is poor.   Id. at p. 22; and

> The claimant has poor compliance with taking care of her diabetes, monitoring her blood sugars, taking her medications, and properly eating.   Many of her symptoms would be eliminated if she would follow medical instructions.   Id. at p. 23.

Based on these findings, the ALJ concluded "the claimant's medically

determinable impairments could reasonably be expected to cause the alleged

symptoms; however, the claimant's statements concerning the intensity,

persistence and limiting effects of these symptoms are not credible . . . ."   Id. at

p. 22.   Ms. Quick Bear challenges these conclusions arguing "the ALJ rejected

[Ms. Quick Bear's] complaints of disabling fatigue, pain, and blurry vision almost

exclusively due to his belief that she consciously disregarded doctor's orders and

---

[3]A bone density test on December 7, 2009, showed mild osteopenia, severe degenerative disk disease at L5-S1 and degenerative disk disease at L4-L5. (Docket 15 ¶ 13).

if she had taken better care of herself, she would be able to work." (Docket 17 at p. 2).

The court is to "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'" Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (quoting Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)). In order to evaluate whether the ALJ's credibility finding is supported by the record, the court must lay out the record as it relates to Ms. Quick Bear's diabetes in chronological detail.

Ms. Quick Bear was seen at the Kyle Clinic nine times in 2008 for treatment of diabetes as well as stomach problems, high blood pressure, and neck, knee and leg pain.[4] (Docket 15 ¶ 4). On May 13, 2009, she was seen again primarily for diabetes and was diagnosed as "insulin dependent DM but poor control." Id. ¶ 5. On June 5, 2009, Ms. Quick Bear was seen at the Indian Health Service ("IHS") Hospital emergency room in Pine Ridge, South Dakota, requesting refills of her insulin and complaining of blurred vision. Id. ¶ 6. She was next seen on June 26, 2009, for her diabetes mellitus, hypertension, and GERD[5] and it was noted she had been checking her blood sugars and they were between 115 and 180. Id. ¶ 7.

---

[4]All subsequent medical clinic contacts occurred at the Indian Health Clinic in Kyle, South Dakota, unless otherwise indicated.

[5]Gastroesophageal Reflux Disease.

On July 23, 2009, Ms. Quick Bear was seen by Dr. Qualm for an annual diabetic eye exam.   Id. ¶ 8.   She did not have any visual complaints and was taking insulin, Lisinopril for blood pressure control and to protect kidneys, Metformin for blood sugar control, Naproxen for pain, Pioglitazone for blood sugar control, Ranitidine for stomach acid, and Simvasatin for cholesterol.   Id. Dr. Qualm diagnosed myopia[6]  with astigmatism[7]  in both eyes, presbyopia,[8]  and changed her prescription.   Id.

On August 14, 2009, Ms. Quick Bear was admitted to the Rapid City Regional Hospital in Rapid City, South Dakota.   Id. ¶ 48.   She was experiencing recurrent episodes of chest pain and episodes of dizziness and shortness of breath.   Id.   While in the hospital, her blood sugar level was 520 which came down to 396 after being given 15 units of insulin.   Id. ¶ 9.

On September 11, 2009, Ms. Quick Bear was seen at the Kyle Clinic for management of diabetes and a headache.   Id.   She estimated her blood sugars levels had been running 140-320, and she had been checking her levels every

---

[6]Nearsightedness.

[7]"Astigmatism is a vision condition that causes blurred vision due either to the irregular shape of the cornea, the clear front cover of the eye, or sometimes the curvature of the lens inside the eye.   An irregular shaped cornea or lens prevents light from focusing properly on the retina, the light sensitive surface at the back of the eye.   As a result, vision becomes blurred at any distance." www.aoa.org/patients-and-public/eye and vision problems/glossary of all eye and vision conditions/astigmatism, last visited April 14, 2015.

[8]"Presbyopia is a vision condition in which the crystalline lens of your eye loses its flexibility, which makes it difficult for you to focus on close objects." See footnote 7 at /presbyopia.

other day.  Id.  Dr. Goldstein reported her "diabetes remains out of control,"
and increased her insulin to 24 units daily.  Id.  He noted "because of the
patient's history of non-compliance which in part is secondary to her being
homeless at times, will regulate the patient[']s insulin here in clinic and not have
her self regulate her insulin [doses] at home."  Id.  Dr. Goldstein also noted Ms.
Quick Bear was staying with a friend and was waiting to have a trailer home
assigned to her.  Id.

On October 26, 2009, Ms. Quick Bear was seen for a screening
colonoscopy at the Pine Ridge Hospital.  Id. ¶ 39.  That day her non-fasting
blood sugar level was 346.  Id.  General surgeon Dr. Bogos assessed chronic
gastritis, chronic diverticulosis, without diverticulitis, and "patient on multiple
medications that contribute to the gastritis."  Id. ¶ 40.

On October 28, 2009, Ms. Quick Bear was seen at the Kyle Clinic for
insulin adjustments.  Id. ¶ 10.  The record noted that although she was
previously homeless, Ms. Quick Bear now had a place to stay.  Id.  Her fasting
blood sugar level was 278, so her insulin dosage was increased.  Id.  That day,
Dr. Goldstein consulted with Dr. Repas, an endocrinologist in Rapid City, South
Dakota, who was willing to see Ms. Quick Bear.  Id. ¶ 11.

Dr. Goldstein saw Ms. Quick Bear seven days later on November 4, 2009.
Id. ¶ 12.  Her fasting blood sugar levels had been 238, 250 and 300, and she had
been increasing her long-acting insulin in an attempt to bring those levels down.
Id.  Dr. Goldstein noted that she had not been adhering to her diet or fasting as

8

planned during the last visit.  Id.  Dr. Goldstein again noted her diabetes was out of control and he referred Ms. Quick Bear to Dr. Repas for control of her diabetes.[9]  Id.

On December 9, 2009, Dr. Goldstein saw Ms. Quick Bear.  Id. ¶ 13.  She reported a chest pain episode five days earlier which lasted for eight minutes and she was now experiencing abdominal pain.  Id.  Dr. Goldstein increased her Omeprazole prescription to address the continued abdominal pain.  Id.

On January 27, 2010, Ms. Quick Bear was seen by Dr. Goldstein.  Her blood sugar levels had been running in the 300's up to 473, and she was complaining of intermittent numbness in both feet and blurred vision.  Id. at ¶ 14.  Dr. Goldstein noted she had not been compliant with diet or exercise.  Id. He recommended splitting her insulin doses for ease of administration, better coverage and comfort.  Id.  Dr. Goldstein asked her return in one week to discuss her blood sugar readings.  Id.

On February 26, 2010, Ms. Quick Bear returned to the Kyle Clinic.  Id. ¶ 15; AR at p. 407.  She reported her blood sugar levels had been ranging 288- 526.  (Docket 15 ¶ 15).  Dr. Goldstein noted she was not adhering to a diabetic low fat diet but had been checking her blood sugar levels two or three times a day.  Id.  Dr. Goldstein consulted with Dr. Delgato about admitting Ms. Quick Bear to the hospital to regulate her insulin levels and for a psychiatric consult.

---

[9]Indian Health Service refused to authorize a consultation for Ms. Quick with Dr. Repas.  (Docket 15 ¶ 15).

Id.  Dr. Delgato determined that since her blood sugar level that day was only 281, she would not meet the criteria for hospital admission.  Id.  Dr. Goldstein referred Ms. Quick Bear to psychiatrist Dr. Gray for anxiety and a mental status evaluation, noting "not sure why she is non[-]compliant with taking her mediations . . . ."  Id.  In the meantime, Dr. Goldstein instructed Ms. Quick Bear to remain on 30 units of Detemir insulin in the morning and 30 units in the afternoon.  Id.

On March 29, 2010, psychiatrist Dr. Gray examined Ms. Quick Bear.  Id. ¶ 17.  He diagnosed she was suffering from an anxiety disorder but needed to rule out a major depressive disorder and post-traumatic stress disorder.  Id.

On April 28, 2010, Ms. Quick Bear was seen by Dr. Goldstein.  Id.  He noted she had not been fasting and did not bring in her glucometer to check blood sugar levels.  Id.  She reported her blood sugar levels were running between 180 and 220.  Id.  Dr. Goldstein noted Ms. Quick Bear was self-medicating with her long-acting insulin even though he had advised her to have the clinic administer those dosages.  Id.  Because she had missed an appointment with Dr. Liebowitz back in March, the appointment was rescheduled for May 6, 2010.  Id.

On May 7, 2010, she was seen at the IHS hospital complaining of pain, blurred vision and problems with diabetes control.  Id. ¶ 41.  Dr. Liebowitz recommended x-rays for her knees and back and an orthopedic consultation.  Id.  Her blood sugar level was 264.  Id.  Dr. Liebowitz advised her she needed

tighter control of her diabetes to avoid kidney and eye damage.   Id.   Dr.

Liebowitz increased her insulin to 40 units in the morning and 36 units in the

afternoon.   Id. ¶ 19.

On May 17, 2010, Ms. Quick Bear was seen at the IHS hospital.   Id. ¶ 42.

Her complaints included a blood sugar level of 593, fatigue, generalized aches

and pains and frequent voiding.   Id.   The staff physician ordered multiple

insulin injections and noted her diabetes was uncontrolled.   (AR at p. 498).

On May 28, 2010, Ms. Quick Bear was seen by Dr. Celeste Blanken.   (Docket 15

¶ 18).   Dr. Blanken noted Ms. Quick Bear was not following a diabetic diet,

which Ms. Quick Bear attributed in part to a lack of money.   Id.   During this

clinic visit her blood sugar level was 260.   Dr. Blanken noted Ms. Quick Bear

was getting "little to no exercise."   Id.

On June 8, 2010, Ms. Quick Bear was finally approved by IHS for a

consultation with endocrinologist Dr. Repas.   Id. ¶ 44.   He noted she carried a

diagnosis of type II diabetes since 2004.   Id.   He noted she had some tingling

and burning in her feet presumably due to diabetic neuropathy and some blurry

vision, but no diagnosis of retinopathy.   Id.   Dr. Repas reviewed Ms. Quick

Bear's blood sugar levels which had been ranging from 300 to 600, with many of

the reports being in the 300-400 range.   Id. ¶ 45.   Dr. Repas observed she was

trying to eat correctly but it was a challenge for her.   Id.   Ms. Quick Bear had

received diabetic education and was considering joining a diabetic support

group.   Id.   Dr. Repas noted a number of maladies including fatigue, blurred

vision, joint pain and muscle aches.   Id.   He diagnosed Ms. Quick Bear's

condition to include type II diabetes mellitus, uncontrolled and requiring insulin,

and tingling and burning extremities, presumably due to diabetic neuropathy.

Id.   Dr. Repas recommended her insulin be increased, concluding her diabetes

was "insulin resistant."   Id.   He wrote prescriptions for Novalog, Humalog and

placed her on bolus insulin.   Id. at ¶ 19.

On June 11, 2010, Ms. Quick Bear was seen at the Kyle Clinic by Dr.

Goldstein.   Id. ¶ 19.   He noted her blood sugar levels had been 250 and 400,

but that morning it was 527 as she was not fasting and had not taken her

insulin.   Id.

On July 9, 2010, Dr. Goldstein noted Ms. Quick Bear's blood sugar levels

were running between 135 and 500-plus but averaging in the 300's since her last

visit.   Id. ¶ 20.   He noted she was checking her blood sugars two or three times

a day as opposed to the four times a day recommended by endocrinology.   Id.

Ms. Quick Bear was walking 20 minutes a day, three days a week.   Id.   Dr.

Goldstein noted she was not adhering to a diabetic diet and was not picking up

her prescription refills or taking medications as directed.   He recommended she

slowly increase exercise to 30 minutes a day, five days a week.   Id.

On August 24, 2010, Ms. Quick Bear was seen by Physician Assistant

Michelle Wasson at Dr. Repas' office.   Id. ¶ 46.   The PA noted Ms. Quick Bear

was taking her insulin as prescribed by Dr. Repas but only checking her blood

sugar levels once or twice a day.   Id.   Ms. Quick Bear reported her blood sugar

levels were elevated in the 300's in the morning but at bedtime they were in the mid-to-low 200's. Id. PA Waason noted Ms. Quick Bear was active on the reservation with multiple tribal activities, as well as caring for extended family members.[10] Id. It was recommended Ms. Quick Bear increase her daily activity and work up to walking 45 minutes, six days a week, and improve her diet. Id. It also was recommended Ms. Quick Bear check her blood sugar levels three or four times daily and take her medications as prescribed. Id.

The next day, August 25, 2010, Ms. Quick Bear was seen at the Kyle Clinic. Id. ¶ 21; AR at p. 455. Dr. Goldstein noted she was using her Accu-chek four times a day. (AR at p. 455). She was taking five medications for diabetes and neuropathy and three medications for pain. Id. at pp. 456-57.

On September 17, 2010, Ms. Quick Bear was seen by Emily Huntley another physician's assistant in Dr. Repas' office. Id. ¶ 47. Ms. Quick Bear's blood sugar level was 329. Id. PA Huntley asked Ms. Quick Bear to write down her blood sugar levels four times a day for at least two weeks prior to her next appointment. Id. On September 30, 2010, Ms. Quick Bear was seen by Dr. Qualm complaining of "distance blur." Id. ¶ 22. Dr. Qualm again diagnosed myopia with astigmatism in both eyes and presbyopia. Id.; see also id. ¶ 8.

---

[10]At the administrative hearing, Ms. Quick Bear testified she liked to sew, sit outside and go to pow-wows. (AR at p. 56). It is common knowledge in Western South Dakota that attending a pow-wow entails sitting with family members observing Native American dancers and regalia. There is no suggestion in this record that Ms. Quick Bear was more actively involved in these traditional events.

On October 12, 2010, Ms. Quick Bear was seen by Dr. Goldstein. Id. ¶ 23. She was complaining of fever, fatigue, weight loss, and had been nauseated and vomiting all weekend. Id. Dr. Goldstein diagnosed gastritis, dehydration, elevated liver enzymes, a urinary tract infection, hypertension, gastroesophageal reflux disease and diabetes mellitus type II. Id. Ms. Quick Bear declined an offer to transfer her to the Pine Ridge Hospital. Id. She was given IV fluids, antibiotic medications and asked to return the next day for repeat blood tests and reevaluation. Id. The next day Ms. Quick Bear was seen at the Kyle Clinic and transferred to the Pine Ridge hospital for urinary tract infection, dehydration, elevated liver function tests and persistent abdominal pain. Id. ¶ 24. She remained hospitalized for three days. Id. ¶ 25.

On October 27, 2010, Ms. Quick Bear was seen by Dr. Goldstein. Id. ¶ 26. She was complaining of being dizzy since last night and low blood pressure. Id. ¶ 25. Dr. Goldstein administered a saline IV and recommended she resume all medications, including insulin, when she could eat regularly and take oral fluids. Id. ¶ 26. The next day, Ms. Quick Bear was seen again by Dr. Goldstein. Id. ¶ 27. She had resumed taking her medications, including insulin, but her blood sugar levels were still approximately 300. Id.

On November 11, 2010, Ms. Quick Bear was seen at the Kyle Clinic for medication refills and neuropathy. Id. ¶ 28. She was again diagnosed with type II diabetes uncontrolled and neuropathy. Id. On November 30, 2010, she

was seen by Dr. Goldstein with complaints of chronic paresthesias[11] in both feet. Id. ¶ 29. Her prescription for Gabapentin was helpful. Id. Ms. Quick Bear reported she was walking 15 minutes daily and her blood sugar levels were ranging from 250 to 450. Id.

On December 16, 2010, Ms. Quick Bear was seen by a podiatrist at the Kyle Clinic. Id. ¶ 30; AR at p. 540. She reported that 300 milligrams of Gabapentin was providing better relief, but she was still experiencing tingling in her feet. (Docket 15 ¶ 30). A B12 shot had improved her energy. Id. She was encouraged to keep up the good work on her diabetes. (AR at p. 542).

On February 23, 2011, Ms. Quick Bear was seen again by the podiatrist at the Kyle Clinic. Id. ¶ 31; AR at p. 577. She reported her blood sugar levels had been ranging from the 200's to 180. (Docket 15 ¶ 31). Neurotin was relieving her foot pain, as her pain level was now 3 on a 10 scale. Id.

On March 2, 2011, Ms. Quick Bear was seen at the Kyle Clinic. Id. ¶ 32; AR at p. 581-82. Dr. Livermont noted she was not reliably doing Accu-checks for blood sugar levels, but she was doing morning Accu-checks and stated she was compliant with medications, including insulin. (Docket 15 ¶ 32). Her blood sugar level during the clinic visit was 277. Id. She was noted as being on the maximum dose of Metformin and Actose and needed to start glyburide at 3 milligrams twice daily. Id. On March 22, 2011, she was again seen at the Kyle

---

[11]"An abnormal sensation of burning or prickling caused chiefly by pressure on or damage to peripheral nerves." medical-dictionary.thefreedictionary.com/ paresthesia.

Clinic.   Id. ¶ 33; AR at p. 583-85.   Ms. Quick Bear's principal complaint was that her feet were still painful and she was experiencing pins and needles in both feet.   (Docket 15 ¶ 33).   On March 30, 2011, Dr. Livermont noted that Ms. Quick Bear's blood sugar levels were reported in the range of 260-279, but her level during the clinic visit was 325.   Id. ¶ 34.   Dr. Livermont found Ms. Quick Bear was generally compliant with her medications, diet, and was very active. Id.   He increased her glyburide to 6 milligrams twice daily and if her blood sugar levels were still running high in two months, a further adjustment in insulin would be necessary.   Id.

On May 18, 2011, Ms. Quick Bear was seen by Dr. Livermont.   Id. ¶ 35. She reported being under a lot of stress recently but tried to be compliant with her medications.   Id.   Dr. Livermont increased her Levimir prescription to 40 units and refilled all her other medications for chronic health issues.   Id.

On June 2, 2011, Ms. Quick Bear was seen by the podiatrist at the Kyle Clinic.   Id. ¶ 36.   Pain in her toes was scored as 4 on a 10 scale.   Id. On June 17, 2011, she was seen by the same podiatrist.   Id. ¶ 37.   The pain in her toes on this date was 2 on a 10 scale.   Id.   Throughout 2010 to 2011 Ms. Quick Bear remained on a number of medications for diabetes, neuropathy and pain.   See AR at pp. 486-561.

The ALJ's decision to criticize Ms. Quick Bear's credibility comes down to the statement that "[m]any of her symptoms would be eliminated if she would follow medical instructions."   (AR at p. 23).   This blank assertion ignores the

16

overwhelming weight of the medical evidence. Ms. Quick Bear's diabetes may be uncontrolled, but it is not for a lack of trying to maintain her blood sugar levels. Frequently, the Kyle Clinic physicians and Dr. Repas reported Ms. Quick Bear's diabetes as uncontrolled, requiring the physicians to increase medication levels, change medications and use a multi-dosage process each day.

The clear picture presented throughout Ms. Quick Bear's medical records is that her diabetes was not responding to traditional medical treatments. Contrary to the ALJ's statement, Ms. Quick Bear's diabetic condition would not have been eliminated or even significantly reduced by her strict compliance with the instructions of her physicians.

The ALJ also criticizes Ms. Quick Bear for not testing her blood sugar levels as frequently as instructed by her medical team. But the record discloses that Ms. Quick Bear was told to check her levels "three or four times a day," she was praised at different times for checking her levels "two or three times a day," "four times a day," and was often complimented for her efforts. No physician stated in this record that if Ms. Quick Bear had checked her blood sugar levels consistently four times a day, her diabetes would be under control. Ms. Quick Bear's diabetes was out-of-control when compared to the traditional diabetic patient because of her body's resistance to insulin, not for noncompliance. The record "leave[s] little doubt that [Ms. Quick Bear] did not consciously decide not to follow 'doctor's orders,' but rather lacked the financial resources and the discipline and education needed to understand and follow a strict dietary and

insulin regiment." Tome v. Schweiker, 724 F.2d 711, 713-14 (8th Cir. 1984). While Ms. Quick Bear's medication expenses were covered by the Indian Health Service, the other issues of housing, lack of funds to maintain a strict diabetic diet,[12] and the absence of a consistent explanation by the medical team support the finding Ms. Quick Bear did not set out to "not follow 'doctor's orders.' " Id.

The evidence supporting Ms. Quick Bear's credibility "fairly detracts from [the Commissioner's] decision." Reed, 399 F.3d at 920 (quoting Haley, 258 F.3d at 747); Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994). When examined in detail, the record supports rather than contradicts the testimony of Ms. Quick Bear. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Guilliams, 393 F.3d at 801-02. The ALJ's conclusion to the contrary is not supported by the substantial weight of the evidence. 42 U.S.C. § 405(g); Choate, 457 F.3d at 869; Howard, 255 F.3d at 580. The ALJ erred as a matter of law by discounting Ms. Quick Bear's credibility. Smith, 982 F.2d at 311.

## 2. DID THE ALJ PROPERLY CONSIDER THE OPINIONS OF A TREATING PHYSICIAN?

The ALJ chose to adopt the assessment of a consulting physician, Dr. Anne Winkler, over the opinions and assessment of Dr. Liebowitz, one of Ms. Quick Bear's treating physicians. (AR at p. 23). The ALJ gave "greater weight to the opinion by Dr. Winkler and that of the DDS reviewing medical sources.

---

[12]In addition to the references above, Dr. Wessell when examining Ms. Quick Bear for the Social Security Administration in November 2009 noted she indicated "it was difficult for her to maintain strictly on a diabetic diet because of the availability of proper food, etc." (Docket 15 ¶ 49).

Dr. Liebowitz is a treating physician but his limits are not consistent with [Ms. Quick Bear's] treatment records."  Id.

"A treating physician's medical opinion is given controlling weight if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' "  Choate, 457 F.3d at 869 (quoting 20 CFR § 404.1527(d)(2)).  "A treating physician's opinions must be considered along with the evidence as a whole, and when a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight."  Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) (citations omitted).   The purpose of placing greater weight on a treating source is because they are "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)[.]"   20 CFR § 404.1527(c)(2).   "Generally, even if a consulting physician examines a claimant once, his or her opinion is not considered substantial evidence, especially if, as here, the treating physician contradicts the consulting physician's opinion."   Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001) (citing Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir. 1992)).

Dr. Liebowitz was one of Ms. Quick Bear's physicians at the Kyle Clinic. Dr. Liebowitz personally examined Ms. Quick Bear five times over the course of approximately two years, conducted physical examinations, ordered tests, and visited with his patient and observed her demeanor in response to his questions

and treatment suggestions. Dr. Liebowitz and his colleagues at the Kyle Clinic saw Ms. Quick Bear a total of 19 times. During the time period under examination, Ms. Quick Bear's treating physicians prescribed multiple medications for diabetes, neuropathy and general pain.

Dr. Leibowitz completed a medical source statement of ability to do work related activities (physical). (Docket 15 ¶ 57). He concluded Ms. Quick Bear could lift occasionally up to 20 pounds, carry occasionally up to 10 pounds, could sit, stand, or walk at one time for one hour without interruption and could sit for two hours total in an eight-hour work day and stand and walk for one hour in an eight-hour work day. Id. Dr. Leibowitz opined that for the rest of the four hours in an eight-hour work day Ms. Quick Bear needed to lie down. Id. Dr. Leibowitz also opined Ms. Quick Bear would have difficulty at various times reading very small print due to her blurred vision. Id.

Ms. Quick Bear's treatment records at the Kyle Clinic, the IHS hospital and Regional Medical Clinic frequently acknowledged her fatigue, inability to walk any distance, and her inability to function because of the pain caused by her diabetic neuropathy and degenerative lumbar disc disease. While noting Ms. Quick Bear's "DDD [degenerative disc disease] lumbar," Dr.Winkler neither acknowledged nor evaluated the impact of this severe impairment on Ms. Quick Bear's ability to perform work-related activities. (AR at pp. 559-69).

Dr. Liebowitz's opinion regarding Ms. Quick Bear's inability to read small print is substantiated by the records of the Kyle Clinic. Dr. Qualm diagnosed

Ms. Quick Bear's vision as impeded by myopia with astigmatism in both eyes and presbyopia. (Docket 15 ¶ 8). Dr. Winkler failed to recognize, or at least point out, the fact Ms. Quick Bear had this diagnosis. See AR at pp. 559-69. Both the astigmatism and presbyopia would contribute to Ms. Quick Bear's complaints of blurred vision and inability to read fine print.

Rather than articulate the areas in which the ALJ felt Dr. Liebowitz's opinions were deficient, the ALJ made a blanket statement that the doctor's declaration of Ms. Quick Bear's "limits are not consistent with the claimant's treatment records." (AR at p. 23). The ALJ dismissed Dr. Liebowitz's findings and opinion and instead relied on the opinions of non-examining physicians. "The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (citations omitted).

"Viewed in the context of her medical records, [Dr. Liebowitz's report] is a culmination of the numerous visits [Ms. Quick Bear] had with her . . . doctors and his experience in treating her chronic [conditions]." Brown v. Astrue, 611 F.3d 941, 952 (8th Cir. 2010) (citing Cox v. Barnhart, 345 F.3d 606, 609 (8th Cir. 2003)). The medical record supports Dr. Liebowitz's medical opinions about Ms. Quick Bear's chronic conditions, severe impairments and physical limitations. Id. at 953. Dr. Liebowitz's opinions are consistent with his own notes and are consistent with the other medical sources providing counseling and therapy to Ms. Quick Bear. 20 CFR § 416.927(a)-(f). The ALJ's analysis satisfies neither

the Social Security Administration regulations nor comports with the record in this case. Dr. Liebowitz's assessment is entitled to controlling weight. 20 CFR § 404.1527(d)(2); Choate, supra; Krogmeier, supra.

**STEP FOUR ANALYSIS**

Before considering step four of the evaluation process, the ALJ is required to determine a claimant's residual functional capacity ("RFC"). 20 CFR §§ 404.1520(e) and 416.920(e). RFC is a claimant's ability to do physical and mental work activities on a sustained basis despite any limitations from her impairments. 20 CFR §§ 404.1545(a)(1) and 416.945(a). In making this finding, the ALJ must consider all of the claimant's impairments, including those which are not severe. 20 CFR §§ 404.1545(e) and 416.945(e). All of the relevant medical and non-medical evidence in the record must be considered. 20 CFR §§ 404.1520(e), 404.1545, 416.920(e), and 416.945.

As mentioned above, the ALJ found degenerative disc disease of the lumbar spine but did not incorporate this severe impairment into his analysis of Ms. Quick Bear's RFC. The ALJ also identified obesity as one of Ms. Quick Bear's severe impairments. (AR at p. 18). Other than a general reference to this condition, the ALJ conducted no further analysis of the effect of obesity on Ms. Quick Bear's physical functioning. SSR 02-01p directs that in determining step four of the sequential process an ALJ should consider the following:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the

22

exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

The effects of obesity may not be obvious. . . . Obesity may also affect an individual's social functioning.

An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. . . . In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. . . .

The combined effects of obesity with other impairments may be greater than might be expected without obesity. . . .

(SSR 02-01p at ¶ 8). The evidence shows the ALJ did not consider Ms. Quick Bear's obesity and its effects on her physical abilities in conjunction with her other severe impairments.

In this case, the ALJ rejected Dr. Liebowitz's opinion about Ms. Quick Bear's physical limitations and adopted the opinion of Dr. Winkler to arrive at RFC. (AR at p. 23). Because Dr. Liebowitz's opinion is entitled to controlling weight, the ALJ's RFC, which did not incorporate Dr. Liebowitz's opinions, is not supported by substantial evidence. Ms. Quick Bear satisfied the burden of persuasion to demonstrate her RFC. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

## STEP FIVE ANALYSIS

The "burden of production shifts to the Commissioner at step five." Id. Bill Tysdal, a vocational specialist, testified at the administrative hearing. (Docket 15 ¶ 68). Mr. Tysdal concluded if the limitations reported by Dr. Liebowitz are applied, Ms. Quick Bear could not perform any jobs. Id. Mr. Tysdal "testified that if a worker needed unscheduled breaks for the worker to lay down at least two times a day for at least 20 minutes each time, there would be no work within the national economy that would allow for that." Id.

The court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 409(g). If the court determines that the "record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which the plaintiff is entitled, reversal is appropriate." Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992). Remand to the Commissioner is neither necessary nor appropriate in this case. The Commissioner's own final witness resolves this case in favor of claimant. Ms. Quick Bear is disabled and entitled to benefits. Reversal is the appropriate remedy at this juncture. Thompson, supra.

## ORDER

In accord with the above decision, it is

ORDERED that plaintiff's motion (Docket 17) is granted and the decision of the Commissioner of July 18, 2011, is reversed and the case is remanded to

the Commissioner for the purpose of calculating and awarding benefits to the plaintiff Willa M. Quick Bear.

Dated September 4, 2015.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE